Filed 3/22/24  In re David C. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re DAVID C., a Person Coming Under the Juvenile Court Law. | B330044 (Los Angeles County Super. Ct. No. 20CCJP02000) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JAZMIN L., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore. Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Jazmin L. (Mother) argues the juvenile court erred in terminating her parental rights to her son, David L., because the beneficial relationship exception to termination, described in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i) applied. We conclude the record does not demonstrate as a matter of law that David had a substantial, positive, emotional attachment to Mother. We thus affirm the juvenile court's order terminating Mother's parental rights.

## BACKGROUND

Because the sole issue in this appeal is whether the beneficial relationship exception applied, we confine our factual and procedural summary to that issue and begin by describing the basic legal principles necessary to give that summary context.

_____

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

Mother's notice of appeal included the juvenile court's denial of her section 388 petition. Mother did not make any arguments concerning this denial in her appellate briefs and thus has forfeited the issue. (See *In re Adrian L.* (2022) 86 Cal.App.5th 342, 344, fn. 1 [although notice of appeal included appeal from order denying section 388 petition, parent forfeited any claim of error where opening brief presented no argument on that issue].)

## A. Applicable Legal Principles

When a juvenile court cannot safely return a child to a parent's custody, the court must set a permanency planning hearing under section 366.26. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) " ' "[A]t a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child—adoption, guardianship or long-term foster care." [Citation.] At this stage of the dependency proceedings, adoption is preferred because it ensures permanency and stability for the minors. [Citations.]' [Citation.] Thus, as a general rule, at a section 366.26 hearing, if the trial court finds that the child is adoptable, it must select adoption as the permanent plan and terminate parental rights. (§ 366.26, subds. (b)(1) & (c)(1).)" (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 205-206; see *Caden C.*, *supra*, at p. 631 [under § 366.26, adoption is " 'the norm' "].)

Section 366.26, subdivision (c) states several exceptions to this rule. Relevant here, the beneficial relationship exception applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to . . . [¶] . . . [t]he parents hav[ing] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id.*, subd. (c)(1)(B)(i).)

A parent must prove three elements for the beneficial relationship exception to apply. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) Specifically, a parent must show by a preponderance of the evidence (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would

3

benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at p. 636.)

When the parent has met that burden, "it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Id.* at p. 633.) "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship— in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*)

## B.    The Family and Prior Child Welfare History

Mother and David's father, David C. (Father), have two children together, M.L. (born 2016) and David (born 2019). David also has an older maternal half-sibling, K.L. (born 2012). Father was incarcerated during portions of the underlying dependency proceedings and is not a party to this appeal. Neither K.L. nor M.L. is a subject of this appeal.

In March 2013, while Mother was a minor and in foster care, the juvenile court sustained allegations that K.L. was at risk of harm due to Mother's substance abuse and history of "runaway behavior."[2] The court permanently placed K.L. with

---

[2] The sustained allegations stated that Mother had a five-year history of drug abuse, indicating that she was using drugs as early as 12 years old.

maternal great uncle, Roberto L., and his wife, D.G., under a plan of legal guardianship, and in October 2017, terminated jurisdiction. The record does not indicate why the juvenile court selected legal guardianship as the permanent plan for K.L.

In August 2018, the juvenile court sustained allegations that M.L. was at risk of harm due to Father's domestic violence and Mother's failure to protect, Father's criminal history of substance-related convictions, Mother's history of drug use, and Mother's failure to protect sibling K.L. On November 7, 2019, the juvenile court terminated Mother's and Father's parental rights to M.L. Sometime prior to April 13, 2021, Roberto and D.G. completed their adoption of M.L.

## C. Events Giving Rise to the Petition Concerning David

On March 4, 2020, when David was approximately six months old, the Los Angeles County Department of Children and Family Services (DCFS) received a referral expressing concern for David because DCFS had lost contact with Mother after the court terminated reunification services in M.L.'s case.

On March 9, 2020, two social workers interviewed Mother. Mother stated she was not using drugs or alcohol and had been sober for two years. She explained that when her parental rights to M.L. had been terminated, her lawyer advised her that she no longer had to remain in contact with DCFS. During the interview, a social worker observed David to be alert, smiling, and bonded with Mother. The social worker arranged for Mother to take a drug test that day, and Mother tested negative for drugs and alcohol.

DCFS's investigation revealed that during M.L.'s dependency proceedings, Mother did not drug test or complete the ordered reunification services, including drug counseling and

5

parenting and domestic violence courses. The social worker assigned to M.L.'s case suspected that Mother continued to maintain contact with Father despite his violence towards her and a restraining order against him.

In April 2020, DCFS attempted to speak with Mother on several occasions and was unable to reach her or obtain information about her or David's whereabouts. DCFS concluded David was at high risk for future abuse or neglect.

## D. Petition through Disposition

On April 9, 2020, DCFS filed a petition pursuant to section 300, subdivisions (b)(1) and (j), alleging David was at substantial risk of suffering serious harm as a result of Mother's substance abuse (count b-1) and her abuse or neglect of sibling M.L. and half-sibling K.L. (count j-1).

Mother could not be located and was not present for an April 14, 2020 detention hearing. The juvenile court ordered David detained from Mother and that Mother have one hour of monitored visitation with David at least twice a week.

On May 6, 2020, the juvenile court issued a protective custody warrant for David and an arrest warrant for Mother. On May 13, 2020, Mother was arrested in Calexico while attempting to re-enter the United States. David was not with her. Mother reportedly had fled to prevent DCFS from detaining David. She stated David was in the care of a maternal uncle in Mexicali. Maternal uncle transported David to the border for DCFS to retrieve him. During a later interview, Mother told the social worker that she took David to Mexicali because persons living in the home where she and David had resided frequently interacted with the public as part of their automobile repair business and she was fearful of COVID-19. The owner of the home confirmed

6

Mother took good care of David and left due to David's young age and Mother's concern that he might contract the virus.

On May 15, 2020, the juvenile court recalled the arrest and custody warrants. The court placed David with Roberto and D.G. and ordered monitored visitation for the parents three times a week for three hours per visit. Roberto and D.G. indicated they were willing to adopt David and keep the siblings together.

On July 7, 2020, following Father's release from jail, DCFS filed an amended section 300 petition, adding allegations relating to Mother and Father's domestic violence (counts a-1, b-2, j-2) and Father's substance abuse (counts b-3, j-3).

DCFS's jurisdiction and disposition report signed July 7, 2020, indicated that according to Roberto and D.G., since David's placement with them on May 15, 2020, Mother visited David twice for a minimum of two hours each visit.[3] Mother's work made it difficult to schedule routine visits, and Mother visited David based on her and the caregivers' availability. The caregivers "report[ed] that the visits [went] well and that [M]other [was] appropriate during her visit with [David]."

In an interim report filed September 4, 2020, DCFS reported that Mother had not enrolled in any programs and evaded DCFS. She missed all five drug tests for the period June 12, 2020 through August 21, 2020. However, Mother consistently visited with David on Mondays, Wednesdays, and Fridays for approximately three hours per visit. The visits went well.

---

[3] A social worker interviewed the caregivers on May 27, 2020. Thus, it is likely that Mother's two visits with David occurred between May 15 and 27, 2020.

On October 21, 2020, DCFS reported Mother's visits, scheduled for Wednesdays, Thursdays, and Fridays, were inconsistent.

On December 8, 2020, the juvenile court held the jurisdiction hearing. DCFS reported that Mother was "now visiting fairly regularly." The juvenile court sustained the allegations of inability to provide regular care of David or protect him due to the parents' substance abuse and domestic violence (counts b-1, b-2, and b-3) and dismissed the remainder of the allegations (counts a-1, j-1, j-2, j-3). DCFS recommended that the court bypass reunification services for each parent. The parents objected, and the juvenile court scheduled a contested disposition hearing for December 15, 2020.

Mother did not attend the December 15, 2020 disposition hearing. Her counsel argued that the court should afford Mother reunification services and observed that Mother "and David are extraordinarily bonded. She was his primary caregiver for over half his life and does visit with him regularly." David's counsel stated that, "According to the care[giver], . . . [Mother] does visit. But it is not consistent. It is whenever she wants." DCFS argued neither parent made reasonable efforts to participate in programs or drug test in M.L's case. The juvenile court therefore bypassed reunification services for Mother and Father pursuant to section 361.5, subdivision (b)(10) and (11), and removed David from Mother and Father. The court scheduled a section 366.26 hearing for April 13, 2021. It ordered monitored visitation for Mother and Father with David for a minimum of three times a week for two hours per visit and granted DCFS discretion to liberalize visits.

In a permanency planning adoption assessment signed on December 24, 2020, DCFS reported Mother visited David 30 times in the prior six months.

## E.     Permanency Planning Phase

### 1.     *In California*

On April 7, 2021, DCFS filed a permanency planning report, recommending Roberto and D.G. be permitted to adopt David.  DCFS reported that David, approximately 18 months old at the time of the report, "ha[d] developed a strong attachment to his caregivers," who provided him with "a safe, loving, and nurturing home environment."  He "appear[ed] to be a happy child, who is comfortable in his surroundings," and "laugh[ed] and smile[d] frequently."  As to Mother, DCFS had difficulties locating her, observed she "[did] not maintain consistent contact and/or monitored visits with the child, David," and that David was not bonded with her.

DCFS further reported that David's caregivers planned to move to Arizona at the end of April 2021.  Thus, the juvenile court continued the section 366.26 hearing to allow for an Arizona home study and approval pursuant to the Interstate Compact on the Placement of Children (ICPC).  Throughout the permanency planning period, which took over two years to complete, the juvenile court continued the section 366.26 hearing several times (including on April 13, 2021, August 10, 2021, December 14, 2021, April 13, 2022, August 10, 2022, December 15, 2022, and March 14, 2023), mainly due to delay in obtaining an Arizona ICPC home study and approval, and obtaining D.G.'s divorce decree from Mexico concerning a previous marriage from 1985.  The court held six-month review hearings during this time.

On June 2, 2021, DCFS noted that during the reporting period but before the family moved to Arizona, Mother had "several monitored visits with David." However, Mother "was constantly on her cell[ ]phone and not . . . attentive to David." When D.G. brought this to Mother's attention, Mother became verbally aggressive and terminated the visit.[4]

2. *In Arizona*

As of May 12, 2021, Roberto, D.G., David, and his siblings had moved to Arizona. On June 2, 2021, DCFS reported David appeared content and comfortable in the presence of Roberto, D.G., K.L., and M.L., that "David has a strong bond with [them]," and that they provided David with a safe and nurturing home. The caregivers maintained contact with Mother through telephone calls and text messages when Mother chose to have contact.

In a November 22, 2021 status review report, DCFS reported that a social worker visited David in Arizona on October 15, 2021. The social worker observed, "David interacted with both his siblings and caregivers in a comfortable and positive manner. David did not appear to be afraid of [ ]either of his caregivers," and appeared to have a "strong bond" with them and his siblings. DCFS also reported, "The parents have not made any efforts to visit the child."

---

[4] In a case plan update dated June 10, 2021, DCFS reported that the caregivers described Mother as visiting David "every so often." It is unclear whether this statement refers to visits before or after David moved to Arizona. However, in Mother's opening brief, she describes her first post-move visit with David as occurring in February 2022. Accordingly, the "every so often" visits likely occurred prior to the move.

In an April 1, 2022 section 366.26 report, DCFS reported that according to D.G., "Mother had one visit with David in February[ 2022,] and David was shy around her." "[M]other has not been consistent in her monitored visits with David. Mother has visited the child, sporadically and inconsistently. . . . [W]hen [M]other did [visit] with . . . David, she [wa]s not bonded to him." DCFS concluded, "Mother does not maintain consistent contact and/or monitored visits with the child, David; she does not have a significant bond or relationship with the child. This is evidenced by a poor lack of engagement around the child." David "has developed a strong attachment to his caregivers," and "appear[ed] to be happy, clean, and well-dressed during every [social worker] visit."

In a June 10, 2022 status review report, DCFS reported that according to D.G., in the prior six months, Mother visited David three times on a Saturday or Sunday from 11:00 a.m. to 3:00 p.m. Mother played with David and his siblings, but towards the end of the visits Mother became stressed with the children and ended the visit. In a case plan submitted to the court on June 13, 2022, DCFS reported, "Mother has been visiting [David] recently." DCFS also reported that ICPC home study had been denied on January 4, 2022, because the caregivers had not completed required training.

On July 6, 2022 and November 8, 2022, D.G. reported that Mother had not had any further visits with David. D.G. also reported the ICPC home study had been approved, but Arizona ICPC was unable to confirm this was so. On November 16, 2022, D.G. stated Mother did not call David, but sometimes when David's older sibling called Mother, which occurred

11

approximately every two months, David got close to the phone and spoke with her.

In a February 24, 2023 section 366.26 report, DCFS stated that in the past six months, Mother visited David twice. During the visits, Mother accompanied D.G. as she took David to his pre-kinder daycare classes. On January 26, 2023, a social worker spoke with David's teacher, who indicated David had behavioral issues and cried when "the grandmother" dropped him off. The teacher "began noticing these behaviors when his biological Mother came to drop him of[f] with [D.G.] around December for [approximately] three times." David cried a lot for his Mother and acted up. Also, when he no longer saw his Mother, he became quiet and would not play. The first time the teacher saw Mother was in December 2022. DCFS further advised the court that Arizona would not complete an adoption ICPC until parental rights were terminated.

On March 9, 2023, D.G. reported Mother visited David approximately once a month. There were no concerns reported as to the visits.

During a March 14, 2023, six-month review hearing, Mother requested a written visitation schedule that included virtual and telephonic visits. Further, Mother indicated there had been "issues" with other children in the background during her calls with David. The court ordered a written telephone and virtual visitation schedule be prepared and that DCFS's next report include sufficient information for the court to conduct an analysis of whether the beneficial relationship exception to the termination of parental rights applied.

On May 30, 2023, DCFS reported that according to D.G., Mother visited David once a month. "The visits are not part of a

12

visitation schedule because [M]other can only travel to Arizona from California when she gets the days off from work which are unpredictable. . . .  The visits take place during the day at the caregiver's home.  Mother spends the night at another relative's home.  Mother takes food and snacks for . . . David and plays with him.  Sometimes they go to the local park if weather permits.  David recognizes [Mother] and usually warms up to her after a few minutes at the beginning of the visit.  Mother stays in Arizona for one to three days and then drives back to Los Angeles."  DCFS further reported that the Arizona foster care home study had been approved on January 23, 2023.

On June 12, 2023, Mother filed a section 388 request to change the court's December 15, 2020 order bypassing reunification services and setting a section 366.26 hearing.  Mother had enrolled in an inpatient rehabilitation program for substance abuse and had completed 18 out of 60 days in the program.  Further, she enrolled in a parenting program and was "consistent with in-person visitation once per month[,] traveling to Arizona to spend time with [David]."  At a June 13, 2023 hearing, the juvenile court denied Mother's section 388 request.

## F.    Termination of Parental Rights

On June 13, 2023, the juvenile court held the section 366.26 hearing.  Mother argued the beneficial relationship exception applied and precluded termination of her parental rights.  She observed that she had "maintained regular and consistent visitation with the child monthly," brought him snacks and played with him during visits, attended a recent dental appointment, and that "she and the child share[d] a substantial positive emotional attachment, such that continuation of the relationship benefit[ed] the child and termination of parental

13

rights would be detrimental." Mother requested a plan of legal guardianship. Mother did not submit testimony or evidence in support of her arguments, and instead relied on the facts set forth in DCFS's reports to the court.

The juvenile court ruled that Mother did not carry her burden to demonstrate the beneficial relationship exception applied. In doing so, it observed Mother's efforts to visit David were recent, that Mother was more attached to David than he was to her, and that David had been out of Mother's care for the majority of his life. It found David was adoptable, terminated Mother's and Father's parental rights, granted prospective adoptive parent status to Roberto and D.G., and granted them educational and developmental decision-making rights.

Mother filed a timely notice of appeal.

## DISCUSSION

### A. Standard of Review

As noted above, under *Caden C.*, *supra*, 11 Cal.5th 614, for the beneficial relationship exception to apply a parent must show by a preponderance of the evidence (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at p. 636.)

We focus on the second element or prong of the *Caden C.* test, as we find it dispositive here. We review that second element for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "The substantial evidence standard of review takes on a

14

unique formulation where, as here, 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals.' [Citations.] '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' [Citation.] Specifically, we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' [Citation.]" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.)

## B. The Evidence Does Not Compel the Conclusion that Mother and David Shared a Substantial, Positive, Emotional Attachment

In evaluating whether there exists "a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship" (*Caden C.*, *supra*, 11 Cal.5th at p. 636)—"the focus is the child," and courts may consider "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Id.* at p. 632.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*) A parent must show "something more than the incidental benefit a child gains from any amount of positive contact with [his or] her natural parent." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 318.) Evidence that a parent is "a mere 'friendly visitor' " is insufficient. (*Id.* at p. 319.)

15

Here, Mother failed to adduce sufficient evidence to compel a finding in her favor that David's attachment to her was substantial and positive. Instead, many of the above-described factors support the juvenile court's conclusion that Mother and David did not have such an attachment. Accordingly, Mother cannot meet her burden on appeal to demonstrate the second *Caden C.* requirement as a matter of law. Specifically, by the time the court terminated Mother's parental rights, David had spent more than 80 percent of his young life outside of Mother's care. David was eight months old when he was placed with Roberto and D.G. in May 2020, and he remained out of Mother's care for three years before the section 366.26 hearing in July 2023. Further, David's interactions with Mother did not demonstrate a substantial, positive emotional attachment. DCFS originally observed David to be bonded with Mother when he was approximately six months old. However, about one year later and before David moved to Arizona, DCFS reported that during Mother's visits with David, she "was constantly on her cell[ ]phone and not . . . attentive to David," and that they were not bonded. This assessment did not change thereafter. Rather, when Mother next visited David in Arizona in February 2022, which was approximately eight months after she had last seen him, he was shy around her. During visits in 2023, David continued to require a few minutes to warm up to Mother. Even then, there was no evidence that David had a substantial or positive attachment to her. Indeed, the record contains no evidence that differentiates Mother from an occasional friendly visitor.

Mother argues that David would cry for her after she and D.G. dropped him off at daycare in December 2022 and would not

16

play after she left demonstrates he was bonded to her.  We cannot consider this evidence in isolation from the other facts in the record, and this evidence alone of David's difficult transition time when both Mother and D.G. dropped him off at daycare does not compel a finding as a matter of law that David had a substantial, positive attachment to Mother.  Nor is Mother's argument that she is the only biological parent that David knows persuasive.  (*In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 318.)

Mother next argues that David's permanent placement plan should match the plan of legal guardianship for his older siblings, K.L. and M.L.  The record does not describe why the juvenile court believed legal guardianship was an appropriate plan for K.L.  As to M.L., although DCFS sometimes describes Roberto and D.G. as M.L.'s legal guardians, the juvenile court's termination of Mother's and Father's parental rights to M.L. indicates the permanent plan was not legal guardianship.  Further, the record includes references to Roberto and D.G. adopting M.L.  In any event, whether K.L. and M.L. were under legal guardianship has no bearing as to whether Mother had a substantial, positive, emotional attachment with David.

## DISPOSITION

The juvenile court's order terminating Mother's parental rights is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.